IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CELINA WIEGEL, on behalf of all )
others similarly situated, )
)
)
Plaintiff, )
)
)
) No. 09 C 7417
)
v. )
)
STORK CRAFT MANUFACTURING, INC., a )
Canadian corporation, and WAL-MART )
STORES, Inc., a Delaware )
corporation, )
)
Defendants.

MEMORANDUM OPINION AND ORDER

On November 25, 2009, two days after the United States
Consumer Product Safety Commission ("CPSC") and defendant Stork
Craft announced the recall of millions of Stork Craft's drop-side
cribs,[1] plaintiff sued Stork Craft and Wal-Mart to recover for
injuries she claims to have suffered as the owner of one of the
recalled cribs. Plaintiff's original complaint asserted numerous
claims that were later winnowed through amendments and motion
practice. Now remaining are the claims plaintiff asserts in her
Second Amended Complaint (to which I refer, for ease of

---

[1] A "drop-side" crib is one with one side that can be raised and
lowered on a rail to facilitate the placement or removal of the
baby.

reference, as her "complaint") under the Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), and on the equitable theory of unjust enrichment. Defendants have each moved for summary judgment of both of these claims. For the reasons that follow, their motions are granted.

I.

Plaintiff owns a Stork Craft 2007 model Rochester Stages Crib, a drop-side crib that can be converted to a toddler bed and then to a full-size child's bed as its user grows. The crib was purchased for plaintiff in February of 2008, after she selected it from Wal-Mart's online retail site, "walmart.com." Plaintiff began using the crib after her daughter was born in March of 2008, and she used it as a drop-side crib without incident until November of 2009.

On November 23, 2009, Stork Craft voluntarily recalled roughly 2.1 million of its drop-side cribs, including the model owned by plaintiff. The recall notice issued by the CPSC explained:

> The cribs' drop-side plastic hardware can break, deform, or parts can become missing. In addition, the drop-side can be installed upside-down, which can result in broken or disengaged plastic parts. All of these problems can cause the drop-side to detach in one or more corners. When the drop-side detaches, it creates space between the drop-side and the crib mattress. The bodies of infants and toddlers can become entrapped in the space which can lead to suffocation. Complete detachment of drop-sides can lead to falls from the crib.

2

*Infant Entrapment and Suffocation Prompts Stork Craft to Recall More than 2.1 Million Drop-Side Cribs,* ("Recall Notice"), Declaration of Sharon Harris, Exh. 1 [DN 227-1]. The Recall Notice stated that the CPSC, Health Canada, and Stork Craft "are aware of 110 incidents of drop-side detachment," including fifteen entrapments, of which four resulted in suffocation, as well as "fall injuries" including concussions, bumps, and bruises. *Id.* The Recall Notice directed owners of recalled cribs to contact Stork Craft for a free repair kit "that converts the drop-side on these cribs to a fixed side." *Id.* It further "urge[d] parents and caregivers to immediately stop using the recalled cribs," and, until repairing the cribs with the free kit, to "find an alternative, safe sleeping environment for their baby." *Id.*

This recall, while the first involving Stork Craft cribs, was not the first of its kind. In September of 2007, CPSC announced a recall of about one million drop-side cribs manufactured by Simplicity, Inc. The September 2007 recall similarly warned that the "drop-side can detach from the crib, which can create a dangerous gap and lead to the entrapment and suffocation of infants," and noted reports of two infant deaths, seven infant entrapments, and fifty five "incidents" involving the Simplicity crib. Harris Decl., Exh. 15 [DN 227-15]. The

CPSC attributed the Simplicity drop-side failures to "both the hardware and crib design." *Id*.

Thereafter, the dangers associated with drop-side cribs received increasing public attention. In March of 2009, the Chicago Tribune published an article on the subject, prompting Stork Craft's president to observe, "[t]he public is now on notice that drop-sides are bad." Harris. Decl., Exh. 28 [DN 227-28].

When plaintiff discovered that her crib was subject to the November 2009 recall, she dutifully contacted Stork Craft for the repair kit, which her husband installed in December of 2009. Thereafter, plaintiff continued to use the repaired crib without incident as a fixed-side crib until June of 2010, when she converted it to a toddler bed. Plaintiff was not happy with the toddler bed configuration, however, and the crib was disassembled, packed up, and placed in storage shortly thereafter, where it remains to this day.

Plaintiff was fortunate: neither major tragedy nor minor accident befell her child while using the recalled crib in its pre-repair condition. Indeed, until plaintiff's husband installed the repair kit, the drop-side rail functioned as it was supposed to, and none of the dangerous conditions reported in the Recall Notice--broken, deformed, or missing parts, or improper assembly--was present. Still, plaintiff claims that she suffered

economic injury as the owner of the recalled crib and argues that she is entitled to damages to compensate her for the failure to receive what she bargained for, and for the diminution of her crib's resale value.

Plaintiff asserts two theories of liability. Her first is that she was injured by misleading and deceptive statements and omissions regarding the safety of her crib on Wal-Mart's website, which she claims violated the ICFA.[2] Plaintiff states that "she would not have purchased the crib had she known of the safety issues and that her crib would require a repair in order to use it." Pl's Opp. at 18 [DN 223]. Her second theory is that defendants were unjustly enriched by their unfair acts and practices.

Defendants assail these claims on every conceivable front. At the outset, they argue that plaintiff's claim under ICFA is doomed because she has suffered no actual damages. Furthermore, defendants insist, to the extent plaintiff purports to have incurred damages, these damages were not the result of any conduct attributable to them. Plaintiff's ICFA claim is further

---

[2] Plaintiff argues in her opposition that defendants' conduct was both "deceptive" and "unfair" under the ICFA, so this first theory actually encompasses two separate theories. Defendants contend that her claim based on unfairness was not alleged in the complaint or fleshed out in discovery, and that I should not consider it now. This argument is not wholly without merit; but since the unfairness claim does not survive summary judgment in any event, I address it briefly in the interest of caution and completeness.

5

defective, they contend, for the additional reasons that she has not identified any misleading statement, has not come forward with evidence to support her theory that defendants concealed material facts about the safety of her crib, and cannot establish that the marketing or sale of her crib was unfair. Finally, defendants argue that plaintiff's unjust enrichment claim is premised on the same conduct as her ICFA claim and fails for the same reasons, as well as on its merits.[3]

## II.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a summary judgment motion is supported by evidence as provided in Rule 56(c), however, the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

---

[3] Stork Craft raises additional arguments in its reply brief, but I do not consider them. *See Dixon v. Page*, 291 F.3d 485, 499 (7th Cir. 2002) ("As a general rule, we do not consider arguments raised for the first time in a reply brief.").

While it is true that I must view the evidence in the light most favorable to the non-moving party, the "mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010).

To prevail on an ICFA claim based on deceptive conduct, a plaintiff must show: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 922 N.E. 2d 309, 313 (Ill. 2009) (citing *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 860 (1998)). The ICFA affords broader protection to consumers than the common law of fraud in that it "eliminates the element of scienter or the necessity of proof of actual reliance." *Tylka v. Gerber Products Co.*, No. 96 C 1647, 1999 WL 495126, at *4 (N.D. Ill. Jul. 1, 1999) (Norgle, J.) (citing cases). Nevertheless, ICFA plaintiffs still must establish proximate causation. *Siegel*, 612 F.3d at 932. That is, they must show that "*but for* the defendants' conduct," they would have made a different purchasing decision. *Id*. (original emphasis) They also must show that they would have

7

been in a materially better position had they done so.  *See Price v. Philip Morris*, 848 N.E. 2d 1, 57 (Ill. 2005) (Karmeier, J. *specially concurring*).

To evaluate plaintiff's claim under the "unfair practice" prong of the ICFA, I consider the evidence of defendants' practice of marketing plaintiff's crib as a "drop-side" crib that "meets or exceeds all U.S. and Canadian standards" when they allegedly knew that the crib was unsafe, and decide whether that evidence raises a triable issue as to "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers."  *Robinson v. Toyota Motor Credit Corp*., 775 N.E.2d 951, 961 (Ill. 2002).

Plaintiff's second claim is for unjust enrichment, an equitable remedy that is available only when no adequate remedy at law exists.  *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 2005).  To prevail on this claim, a plaintiff must prove "that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *Cleary v. Philip Morris Inc*., 656 F.3d 511, 518 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc*., 545 N.E.2d 672, 679 (Ill. 1989)).

Before turning to my substantive analysis of plaintiff's claims, I pause briefly to note that my task in discerning which facts are genuinely in dispute in this case was made considerably more difficult by the manner in which counsel—most notably for Stork Craft and for plaintiff—handled their submissions pursuant to Local Rule 56.1. As I have observed in the past, L.R. 56.1 contemplates "concise statements setting forth, and responding to, the facts asserted." *Hinman v. M and M Rental Center, Inc.*, 596 F. Supp. 2d 1152, 1154 n. 1 (N.D. Ill. 2009). The purpose of the rule--with which district courts in this circuit are entitled to require strict compliance, *Patterson v. Indiana Newspapers Inc.*, 589 F.3d 357, 360 (7th Cir. 2009)--is to "ensur[e] that the proposed findings of fact are in a form that permits the district court to analyze the admissible evidence supporting particular factual propositions and determine precisely what facts, if any, are material and disputed." *Schmidt v. Eagle Waste & Recycling, Inc.,* 599 F.3d 626, 630 (7th Cir. 2010). When parties fail to abide by these principles, for example by incorporating legal conclusions into their factual statements; by responding to their adversaries' statements with argumentative narratives that recharacterize, rather than respond to, the asserted facts; or by using the L.R. 56.1 statements as a platform for fleshing out their legal arguments, as counsel have done in this case, their

submissions do not serve their intended purpose.[4]  Counsel would

---

[4] For example, one of plaintiff's factual statements asserts: "The Recalled Cribs are defective because the drop-side plastic hardware can break, deform, or parts can become missing," citing to the Recall Notice; an October 16, 2009, email from the CPSC to Stork Craft's president; and a letter from a Stork Craft executive to Wal-Mart that incorporates language from the Recall Notice.  Defendants are entitled to dispute plaintiff's statement to the extent it asserts the legal conclusion that the cribs are "defective." Nevertheless, they must respond, concisely, to the factual portion of the statement, as, indeed, Wal-Mart did in its response. ("Disputed as to Plaintiff's characterization of the cribs as 'defective,' a statement which calls for a legal conclusion, and because such characterization lacks evidentiary support, in violation of L.R. 56.1 and F.R.C.P. 56(e).") Instead, counsel for Stork Craft offers a page-long, meandering diatribe that begins with a non-sequitur and proceeds through a host of objections and legal arguments:

> Plaintiff admits that the drop-side hardware on her crib never broke, no parts became loose or missing, and the drop-side rail never detached. (*See* SUF No. 13) Thus, Additional Fact No. 22 is immaterial to her claims, and should be disregarded.  *See* Obj. 2 *supra*. Further the evidentiary material Plaintiff cites does not support her contention that the recalled cribs are 'defective.'  *See* Objs. 1 and 5 *supra*. *First*, neither the recall notice nor the letter Stork Craft sent to Wal-Mart about the recall, which, in relevant part, simply parrots the language from the recall notice, states that Stork Craft's drop-side cribs are 'defective.' (*See* Harris Dec. at Exh. 1, 7)  Indeed, the notice states that the hardware can break or deform but it does not say that the breakage or deformation is due to any defect in design or manufacturing as opposed to product misuse or abuse.  Rather, Stork Craft and the CPSC have long stated that there is a risk of injury to a child placed in a drop-side crib when the crib is misused or abused or the provided instructions are not followed. (*See* SUF Nos. 56-59, 51).  *Second*, communications that are part of a recall (i.e., Exhibits 1 and 7) are not admissible as evidence that a product is defective.  *See* Fed. R. Ev. 407…."

Stork Craft's response goes on in this manner for another fifteen lines littered with citations to case law before finally petering out with the statement: "To the extent a response is required, Stork Craft disputes that its drop-side cribs are defective. (*See* SUF Nos. 12-13, 17, 32-34, 37-45)."  This kind of response is, frankly, exhausting and wasteful for everyone involved, and

be well advised to bear these principles in mind.

Now on to the substance of plaintiff's claims. As previewed above, plaintiff identifies two statements she viewed on Wal-Mart's website as misleading. The first is the characterization of her crib as a "drop-side crib." The second is the statement that the crib "meets or exceeds all U.S. and Canadian standards." Defendants argue that these statements do not support plaintiff's ICFA claim because, quite simply, they are true, and none of plaintiff's evidence suggests otherwise.

As to the first statement, defendants are plainly correct. Plaintiff's crib was unquestionably equipped with a drop-side when she purchased it, and, in fact, plaintiff does not dispute that she used the drop-side feature for over a year and a half before her husband applied the immobilizer, after the recall, to convert the crib into a fixed-side crib. Plaintiff does not meaningfully dispute that the statement about the crib's drop side was true at the time it was made, but she argues that it "became untrue" after the crib was recalled, and is therefore actionable as an innocent misrepresentation under ICFA, citing, *inter alia*, *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 12 (Ill. 2011), and *Falcon Associates, Inc. v. Cox*, 699 N.E.2d 203 (Ill. App. Ct. 1998). But Illinois law does not contemplate ICFA liability for statements that, while true when made,

---

it surely is not the kind of statement L.R. 56.1 contemplates.

"become" untrue in light of intervening events. Rather, as plaintiff's cited authorities indeed make clear, an "innocent misrepresentation" is a deceptive statement that is made in good faith, without the intent to deceive. *Miller,* 762 N.E.2d at 12 ("[n]or need the defendant have intended to deceive the plaintiff; innocent misrepresentations or material omissions intended to induce the plaintiff's reliance are actionable"); *Falcon Associates*, 699 N.E.2d at 210 ("[t]he intention of the seller—his good or bad faith—is not important. Rather, we focus our attention upon the effect that [the] conduct might have on the consumer…"). No reasonable jury could conclude that defendants violated ICFA based on the statement, in February of 2008, that plaintiff's crib had a drop side.

As for the statement, "meets or exceeds all U.S. and Canadian standards," plaintiff does not dispute that prior to the time plaintiff viewed Wal-Mart's website, Stork Craft, Wal-Mart, and Consumer Testing Laboratories [Far East] Ltd. ("CTLFE"), a third-party entity certified by the International Organization for Standardization as an ISO 9001 testing organization, had each tested the 2007 Rochester Stages Crib for compliance with 16 C.F.R. § 1508 and ASTM F1 169 and found that the crib complied with these standards. Plaintiff also does not dispute that the Juvenile Products Manufacturers Association ("JPMA") certified the 2007 Rochester Stages Crib as compliant with all U.S.

12

regulations, as well as with ASTM F1 169. Plaintiff acknowledges, moreover, that the CPSC urges consumers to look for the JPMA safety seal to "ensure that the product meets national safety standards." *See* Bucci Decl., Exh. 11 [DN 169-1 at 144]. Plaintiff does not assert that these tests were deficient, nor indeed does she controvert evidence that, in developing the procedures and protocols used to test Stork Craft's cribs for compliance with 16 C.F.R. § 1508, Stork Craft and CTLFE relied on guidelines published by the CPSC on how to test full-size cribs for compliance with the applicable standards.

Plaintiff raises two arguments as to why "meets or exceeds all U.S. and Canadian standards" is nevertheless misleading. First, she asserts that her crib does not, in fact, comply with 16 C.F.R. § 1508.6(a), which provides:

> A crib shall be designed and constructed in a manner that eliminates from any hardware accessible to a child within the crib the possibility of the hardware's presenting a mechanical hazard through pinching, bruising, lacerating, crushing, breaking, amputating, or otherwise injuring portions of the human body when the crib is in normal use or when subjected to reasonably foreseeable damage or abuse.

As noted above, however, plaintiff does not allege any deficiency in the tests or testing procedures that found the 2007 Rochester Stages Crib to satisfy all of the requirements of 16 C.F.R. § 1508. As putative evidence of noncompliance, plaintiff points only to the Recall Notice itself, and to a reference, in an

13

October 19, 2009, email from the CPSC to Stork Craft's president, to the "weakness of the plastic hardware" in the recalled cribs. But nothing in either of these documents suggests that the recalled cribs did not comply with 16 C.F.R. § 1508.6(a). Indeed, that regulation, on its face, is directed to different issues than the "detachment" problems identified in plaintiff's cited evidence.

Plaintiff's next argument is that regardless of whether the statement "meets or exceeds all U.S. and Canadian standards" is literally true, it is misleading because it conveys that the cribs are "safe," when in fact they are not, as the infant injuries and deaths described in the Recall Notice make clear. For this argument, plaintiff relies on *Kleczek v. Jorgensen*, 767 N.E.2d 913 (Ill. App. Ct. 2002). Specifically, plaintiff quotes the portion of that decision that held, "a statement which is technically true as far as it goes may nevertheless be fraudulent, where it is misleading because it does not state matters which materially qualify the statement as made." *Id*. at 919. Plaintiff insists that the "overriding issue…is whether the representation that the drop-side cribs were safe was true," Pl.'s Opp. to Stork Craft's Mot., 20 [DN 223], and argues that the evidence is sufficient to enable a jury to conclude that they were not. Accordingly, she contends, her ICFA claim is inappropriate for summary judgment.

14

This argument has superficial appeal, but its flaws are revealed upon closer scrutiny. I begin with a discussion of *Kleczek,* since the factual distinctions between that case and this one bring the problems with plaintiff's argument into focus.

In *Kleczek*, a home developer built a house and installed a portion of the plumbing himself, although he was not a licensed plumber.[5] He then received a visit from two state plumbing inspectors who verbally identified certain plumbing defects and told the defendant that he had to have a licensed plumber finish the work if the house was intended for sale to a third party. Two weeks later, the defendant contracted with the plaintiffs for the sale of the house, and the contract included the statement, "[P]rior to the execution of this instrument[,] neither [seller] nor [seller's] agent has received any notice issued by any city, village[,] or other government authority of a dwelling code violation in the dwelling structure upon the premises herein described." 767 N.E.2d at 916.

Approximately a month later, but still before the sale closed, the defendants received a certified letter issued by the state plumbing inspectors that detailed the list of plumbing

---

[5] The defendants in *Kleczek* were actually a married couple in the business of building new houses. For ease of reference, however, I refer to the husband, who was responsible for the plumbing, as "the defendant." This change is immaterial to my analysis.

repairs that needed to be made to bring the house up to code. The defendant did not disclose either the inspector's visit or the subsequent letter to the plaintiffs before the closing. He did, however, hire a licensed plumber who installed the rest of the plumbing and corrected all of the defects identified in the letter.

After the sale was consummated, the plaintiffs experienced a series of plumbing problems, prompting them to seek an inspection. *Id*. at 1017. When the plaintiffs discovered that the state inspector had viewed the plumbing prior to their agreement to purchase the house, and had notified the defendant of plumbing defects at that time, the plaintiffs sued the defendant under the ICFA. *Id*.

The defendants argued that the statement in the contract about not receiving notice was literally true because notice hadn't been "issued" at that time. The court agreed that the clause, as written, could be construed as literally true but held that it was nevertheless misleading because "it created the false impression that no governmental authority had informed [the defendant] of any violations of a dwelling code, including the plumbing code." *Id*. at 1021.

Of course, what mattered to the plaintiffs was not *how* the state inspection authorities had informed defendants of any code violations, but *whether* they had. That question was plainly

susceptible to a "yes" or "no" answer. And the statement at issue effectively communicated that the answer was "no," when in fact it was "yes." Under these circumstances, the court sensibly declined to elevate form over substance, rejecting the overly technical argument that the statement was literally true, even if substantively false.

Matters are not so cut-and-dried in this case. To begin, whether a product is "safe" is not so easily susceptible to a binary "yes" or "no." Some consumers might consider a crib to be safe if its failure rate is less than, say, 1-in-100,000. Others might require a lower rate, maybe one in a million, or even zero known incidents in the crib's history. Still other consumers might focus on the type of incident, rather than on the number, or on the seriousness of the potential injuries, to decide whether they consider a crib safe. Indeed, whether a product is "safe" is virtually impossible to quantify in any reliable or uniform fashion, other than by reference to objective criteria such as those set forth in the regulations and industry standards discussed above.

That is not to say that objective standards other than the federal regulations and industry standards cannot or do not exist. But plaintiff has not identified any with which a reasonable jury could find her crib fails to comply based on the evidence presented in this case.

17

But what about the evidence that infants and young children were injured, or even killed, while using the recalled cribs? If this were a products liability suit, a jury would certainly consider that evidence, along with the evidence that the crib passed all regulatory and industry compliance testing, in deciding the ultimate question of whether plaintiff's crib was safe for its intended use. A jury might, in such a case, conclude that the crib was *not* safe, *despite* its compliance with all applicable standards. This illustrates that these are two substantively distinct inquiries. It might also suggest that the applicable standards were inadequate to ensure that a product was sufficiently safe to meets consumers' expectations. But it does not make it a misrepresentation to state that the crib complied with those standards, when that is what the undisputed evidence shows. Unlike in *Kleczak*, defendants' statement was accurate in substance.

Plaintiff also argues that defendants' representations about the crib were misleading for what they omitted, specifically: that infants and young children were reported to have been injured or killed while using the cribs; that the 2007 Rochester Stages Crib would be recalled and require conversion to a fixed-side crib to be used safely; and that the cribs could not be

resold.[6] "Unlike an action for misrepresentation under the [ICFA], where even innocent misrepresentations can support liability, an action for fraudulent concealment logically demands that defendants have prior knowledge of the information that they are alleged to have suppressed." *Miller v. William Chevrolet/GEO, Inc.,* 762 N.E.2d 1, 14 (Ill. App. Ct. 2001).[7] Yet plaintiff's evidence of defendants' knowledge, in February of 2008, of the information she claims they concealed is slim.

As to the first alleged omission, even setting aside the practical difficulties of requiring defendants to inform prospective crib buyers about injury reports brought by other consumers, the evidentiary record simply does not lend itself to the reasonable conclusion that defendants omitted any reports of which they were aware; that they did so with the intent that plaintiff rely on their omission in deciding which crib to

---

[6] In her opposition, plaintiff enumerates seven alleged omissions, but several of these—such as the putative omission that "the concerned Stork Craft drop-side cribs do not comply with 16 C.F.R. section 1508.6(a)"—are substantively addressed elsewhere in this opinion.

[7] Plaintiff argues, in opposition to Wal-Mart's motion, that Wal-Mart "morphs" her omission claim into a claim for fraudulent concealment. But plaintiff does not explain how doing so alters the relevant analysis, nor does she cite any authority for treating omissions like affirmative representations (which do not require knowledge of falsity), rather than like concealments (which do). Indeed, in both of the cases plaintiff cites to support her "omissions" argument--*Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (1996), and *Totz v. Continental Du Page Acura*, 602 N.E. 2d 1374 (Ill. App. Ct. 1992)--the defendants were found to have had (*Totz*) or pled to have had (*Connick*) the requisite knowledge.

purchase; or that her selection of the 2007 Rochester Stages crib was the result of that omission.

Plaintiff identifies a chart that appears to document consumer complaints compiled by the CPSC, which was attached to an October 16, 2009, email from the CPSC to Jim Moore, Stork Craft's president. Even assuming this evidence were admissible over Stork Craft's hearsay objection (to which plaintiff offers no response, nor does she make any effort to substantiate, interpret, or explain the document through competent witness testimony),[8] plaintiff fails to show that defendants had any knowledge of the incidents anthologized in the chart before the chart was transmitted to Mr. Moore in October of 2009. Indeed, in one of the emails in the chain including the chart attachment, Mr. Moore expressed surprise at the number of reports the CPSC indicated it had received: "No one has mentioned any 81 incidents of detachment or 21 falls to me?" (sic) Harris Decl., Exh. 23 at SC003489 [DN 227-23].

Nor is the Recall Notice itself evidence that defendants knew about, but concealed, any injury reports. On its face, the Recall Notice states that, as of the recall date, "the CPSC,

---

[8] Plaintiff offers only the testimony of Stork Craft' Chief Operating Officer, Jude Emnace, who, when asked if he had ever seen the email to Moore, replied, "No, I don't think so." Emnace then testified that he "may have" seen the chart before, though not in the same form. As far as the record reveals, Emnace was asked nothing further about the chart.

Health Canada, and Stork Craft are aware of 110 incidents of drop-side detachment." Harris Decl., Exh. 2 [DN 227-1]. But because it says nothing about *when* any of these entities became aware of the cited incidents, it does not support the inference that defendants knew about them in February of 2008. In any event, under Illinois law, a recall announcement is not evidence of concealment. As the Illinois Appellate Court explained in *Jensen v. Bayer AG*, 862 N.E. 2d 1091, 1099 (Ill. App. Ct. 2007), were it otherwise, "any recall announcement…would provide a *prima facie* case for concealment. This result, in our view, constitutes an unsupportable and unreasonable extension of the [ICFA]." *Id*.

Further, as Stork Craft points out, plaintiff concedes that she is not aware of any crib manufacturer who provides the type of information she claims defendants wrongfully omitted. Accordingly, the inference that defendants omitted consumer reports of injuries from Wal-Mart's website in an effort to induce plaintiff to select the 2007 Rochester Stages Crib over other cribs (i.e., to induce reliance on the omission), is implausible, as is the inference that her purchase was the "result of the [alleged] deception." *De Bouse v. Bayer*, 922 N.E. 2d 309, 313 (Ill. 2009).

The evidence supporting the remaining alleged omissions-- that the 2007 Rochester Stages Crib would be recalled, that it

would require conversion to a fixed-side crib to be used safely, and that it could not later be resold--is likewise insufficient to withstand summary judgment. Plaintiff relies heavily on defendants' awareness of the Simplicity crib recall, and defendants' putative awareness that all drop-sides would be banned in the future, as evidence that defendants knew, at the time she purchased her crib in February of 2008, that it would later be recalled (and, she claims, unsellable thereafter).

The Simplicity recall, as noted above, attributed that crib's failures to "both the hardware and crib design." Plaintiff offers neither argument nor evidence to establish that the "hardware and design" of her 2007 Rochester Stages Crib was so similar to the recalled Simplicity crib that defendants had to have known that her crib, too, would be recalled. Nor can she rely on the mere fact that both cribs were drop-sided. Indeed, in her opposition to summary judgment, plaintiff identifies the *Ragazzi* drop-side crib manufactured by Stork Craft as an alternative crib she might have purchased, arguing that that crib was not subject to the November 2009 recall, despite its drop-side feature.

Plaintiff next points to an email from Jim Moore dated March 18, 2009, as evidence of Stork Craft's knowledge that her crib was defective. The subject of the email is "Coverage from the Chicago Trib.," and the body reads, in full, "[a]ll I can say is

22

it is a darn good thing we started on this over one year ago. Now we have to move quickly to change everything over and sell through inventory. The public is now on notice that drop-sides are bad." Harris Decl., Exh. 28 [DN 227-28]. This email is the centerpiece of plaintiff's argument that defendants knew, in February 2008, that her crib was unsafe and would be recalled twenty-one months later. But the email is not the smoking gun plaintiff makes it out to be.

The Chicago Tribune article to which the email undisputedly relates is not part of the record in this case, and neither party makes any representation about its content, other than to agree that it generally cast drop-side cribs in a negative light. With this amorphous reference as their only contextual mooring, the statements "we started on this over a year ago," and "drop-sides are bad," are simply too vague to support plaintiff's claim that Stork Craft knew, in February of 2008, that the 2007 Rochester Stages Crib had safety problems that would lead to its recall in November of 2009, or that a repair kit to convert the crib to a fixed-side crib would emerge as the solution.

Neither does this evidence permit the inference that defendants knew of plaintiff's supposed inability to resell her crib. Plaintiff argues that 15 U.S.C. § 2068(a)(2)(B) proscribes the resale of her crib under any circumstances, that is, regardless of whether it has been converted to a fixed-side crib.

In an earlier opinion, I noted that defendants did not dispute this interpretation. *Wiegel v. Stork Craft Mfg., Inc.,* 780 F. Supp. 2d 691, 694 (N.D. Ill. 2011).[9] But even if the statute is construed to prohibit the resale of the crib in its converted, fixed-side state, the evidence does not support the conclusion that defendants knew, in February of 2008, that the crib would be recalled, as discussed above. Accordingly, they could not have known of, but concealed, the putative future prohibition on the crib's resale.

Plaintiff's argument that Stork Craft knew in February 2008 about the "impending" ban on drop-side cribs is equally ill-supported. She cites an excerpt from Mr. Moore's deposition testimony in which he addresses the March 18, 2009, "Coverage from the Chicago Trib.," email discussed above. Moore refers to the "issues that came out with special interest groups, the CPSC and related," which led the industry to "transition away from drop-side cribs." He explains:

---
[9]

Section 2068(a)(2)(B) prohibits the sale of any consumer product that is

> subject to voluntary corrective action taken by the manufacturer, in consultation with the Commission, of which action the Commission has notified the public or if the seller, distributor, or manufacturer knew or should have known of such voluntary corrective action.

15 U.S.C. § 2068(a)(2)(B). Plaintiff's crib was recalled because of safety concerns related to a specific part: the drop-side. There is no dispute that the repair kit resolved the safety concerns prompting the recall by immobilizing the hazardous part, which, as plaintiff herself insists, turned the crib into a "fundamentally different product." Pl.'s Opp. at 1 [DN 219-1]. If so, the new product would not be "subject to voluntary corrective action," and there is no evidence that it falls within any other category of products whose sale is prohibited by 15 U.S.C. § 2068(a)(2)(B).

> So I guess the best way to look at that is that the transition away from drop-side cribs, from our perspective, was partly a business decision insofar as we have to be mindful of what's going on in the industry, and it was obvious to us that with these special interest groups that there was going to be at some time in the future a move away from this mainstay and what the consumer demanded was going to be in the future. So being proactive what we did is we started to develop fixed-side cribs and change over all of our Stork Craft cribs to have no drop side because it was our opinion that we could see the writing on the wall, that at some point in time the entire industry was going to move away from that.

Moore Dep. at 22-23, Harris Decl., Exh. 11 at 4 [DN 227-11]. This testimony simply does not reveal that Stork Craft knew, yet concealed, that drop-side cribs would "imminently" (or ever) be banned.

I now turn briefly to plaintiff's argument that defendants violated the ICFA's proscription of "unfair" trade practices by selling a crib that was later recalled. As noted above, my analysis of the evidence focuses on: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002). As the foregoing discussion explains, plaintiff's evidence does not support the reasonable conclusion that defendants knew that the 2007 Rochester Stages Crib presented unreasonably high safety risks (indeed, the undisputed evidence is that the crib passed all safety-related

tests), or that it would later be recalled. Plaintiff seeks to attenuate the uncontroverted evidence that defendants subjected the 2007 Rochester Stages Crib to CSPC-approved, independent third-party testing procedures with a lengthy excerpt from a September, 2010 press release in which Illinois Attorney General criticized the JPMA for certifying drop-sided cribs. But not only was that press release issued over two-and-a-half years after plaintiff purchased her crib, the Attorney General's censure of the JPMA offers no support for plaintiff's argument that in February of 2008, defendants knowingly sold dangerously defective cribs, or that they made misleading representations about the crib's characteristics or safety attributes.

On this record, there is no need to delve deeply into the three considerations cited in *Robinson* to ascertain whether defendants violated the "unfairness" prong of the ICFA. However horrifying it may be--and there is no question that it is--to imagine infants and children suffering fatal accidents in their cribs, the evidence in this case is not such as could reasonably support the conclusion that defendants engaged in conduct of the kind proscribed by the "unfair practices" section of the statute. Indeed, plaintiff identifies no authority finding a violation on facts such as those established by the record here.

Because I conclude on the foregoing grounds that plaintiff's ICFA claim does not survive summary judgment, I need not reach defendants' remaining arguments with respect to that claim.

Finally, I turn to plaintiff's claim for unjust enrichment, which requires only brief analysis. The parties agree that where an unjust enrichment claim is "based on the same conduct underlying [an] ICFA claim," the two claims fall together. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 518 (7th Cir. 2011). That is the plainly the case here. In her opposition, plaintiff argues that her unjust enrichment claim is separate from her ICFA claim because it "is based on the facts that Stork Craft's drop-side cribs are defective, unsafe without the installation of the repair kit, cannot be re-sold, and no longer function in a drop-side capacity." Pl.'s Opp. at 36 [DN 223]. But these are the very facts she asserts in support of her ICFA claim. Indeed, her argument that "[t]hese facts are not matters of misrepresentations, omissions, or unfair conduct" runs directly contrary to most everything she argues in opposition to summary judgment of her ICFA claim. Plaintiff cannot have it both ways; having insisted that these facts support both her ICFA claim and her unjust enrichment claim, she cannot then be heard to argue that the two claims do not "rest[] on the same improper conduct." *Id*.

III.

For the foregoing reasons, defendants' motions for summary judgment are granted.

Dated: May 21, 2013

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge
